## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 20 2019, 7:30 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Roberta L. Renbarger
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Termination of the Parent-Child Relationship of: M.T. (Minor Child);

N.D.T. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 20, 2019

Court of Appeals Case No.
19A-JT-1422

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

Trial Court Cause No.
02D08-1809-JT-324

**Pyle, Judge.**

# Statement of the Case

N.D.T. ("Mother") appeals the termination of the parent-child relationship with her son ("M.T."), claiming that there is insufficient evidence to support the termination because the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that the conditions that resulted in M.T.'s removal will not be remedied. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.

We affirm.

# Issue

> Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

The facts most favorable to the termination reveal that Mother is the parent of M.T., who was born in August 2008. DCS removed six-year-old M.T. from Mother's home in March 2015 because Mother, who had difficulty controlling her anger, had been physically abusing M.T. by striking him with a belt and hitting him in the chest. Mother also smoked marijuana daily, often in the presence of M.T.

In March 2015, DCS filed a petition alleging that M.T. was a child in need of services ("CHINS"). At a hearing on the petition, Mother admitted that she

had difficulty controlling her emotions when she was upset by day to day conflicts or issues. She also admitted smoking marijuana in front of M.T. in the past. Further, she stated that M.T. was in need of care, treatment, or rehabilitation that he was not receiving and that he was unlikely to receive without the coercive intervention of the court.

[3] Three months later, in June 2015, the trial court issued a dispositional order that required Mother to: (1) obtain a drug and alcohol assessment and follow all recommendations; (2) obtain a psychiatric evaluation and follow all recommendations; (3) participate in cognitive behavioral therapy and dialectal behavioral therapy, follow all therapist recommendations, and successfully complete the program: (4) obtain a psychological evaluation from Dr. Lombard ("Dr. Lombard") and follow all recommendations; (5) refrain from the use of illegal drugs; and (6) attend and appropriately participate in visitation with M.T.

[4] After three years of Mother failing to comply with the CHINS dispositional order, DCS filed a petition to terminate her parental rights in September 2018. Testimony at the termination hearing revealed that from the June 2015 CHINS dispositional order until the filing of the September 2018 termination petition, Mother had completed substance abuse assessments at four different centers. However, she had never successfully completed any of the recommended programs. At the time of the hearing, Mother had not participated in any substance abuse services during the prior year. Although Mother had attended a substance abuse assessment at Park Center in October 2018 after DCS had

filed the termination petition, the center refused to accept Mother as a client because of her inappropriate behavior during the assessment. In addition, Mother continued to smoke marijuana throughout the proceedings.

[5] The testimony further revealed that during the course of Mother's life, she had been exposed to severe trauma, which included sexual, emotional, and physical abuse. Mother had been diagnosed with bi-polar disorder and borderline personality disorder, which is characterized by a pattern of volatile explosive relationships and is relevant to a parent's ability to parent her child. Although Mother was referred to cognitive behavioral therapy and dialectical behavior therapy to address these disorders, Mother failed to successfully complete any therapeutic group programs. Many service providers testified that Mother was not willing to acknowledge her mental health issues and that she frequently became hostile with them. Dr. Lombard evaluated Mother and was concerned that her use of marijuana in conjunction with her untreated mental health issues elevated the risk that she would physically abuse M.T.

[6] In addition, the testimony revealed that M.T. was living with foster parents that wanted to adopt him. M.T. had been dealing with emotional and psychological issues that included an adjustment disorder with depression, an attention-deficit disorder, and an attachment disorder, which were being addressed in therapy and with medications. When DCS asked Dr. Lombard how he saw Mother and M.T. coming together and co-existing without Mother having been treated for her drug and mental health issues, Dr. Lombard responded as follows:

[I]t would be the least optimal environment to put those two (2) types of individuals together . . . unsupervised[] because the combined emotional volatility between the two (2) of them, there's going to be situations that occur and if there's not a pattern of them being able to handle intense emotional volatile situations in a healthy way, um, there . . . will be incidents that unfortunately for a child this age, he'll remember it forever."

(Tr. Vol. 2 at 150-51).

[7] Testimony at the hearing also revealed that at the beginning of the proceedings, Mother visited with M.T. twice a week for four to six hours per visit. Over the course of the proceedings, Mother's parenting time was reduced to two hours once a week and then to one hour once a month. The reduction in Mother's visitation was due to Mother's negative behavior. For example, during one visit, M.T. became "antsy." (Tr. Vol. 2 at 235). He stood up and danced around. When Mother asked him why he was dancing, M.T. explained that he was just trying to get rid of his energy. Mother responded that that was why she did not like him "popping pills." (Tr. Vol. 2 at 235). Mother's comment upset M.T., and the visitation supervisor told Mother it was time to end the visit. When Mother told M.T. that the supervisor was trying to separate Mother and M.T., M.T. began to cry. In addition, Mother often used inappropriate language and yelled during visits. She also refused to help M.T. manage his emotions and use his coping skills.

[8] During closing argument, DCS pointed out it had arranged for seven service providers to assist Mother in the reunification process. DCS further explained,

"it's not like we said one and done, you're done.  We kept trying, we kept trying, we kept trying.  And now, four (4) years later, time[']s up."  (Tr. Vol. 3 at 190).

[9] Following the hearing, the trial court issued a detailed eight-page termination order, which concluded that DCS had met its burden of proving that there was a reasonable probability that the conditions that had resulted in M.T.'s removal would not be remedied.  Mother now appeals the termination.

# Decision

[10] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children.  *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013).  However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities.  *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005).  The purpose of terminating parental rights is not to punish the parents but to protect their children.  *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[11] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *K.T.K.*, 989 N.E.2d at 1229.  Rather, we consider only the evidence and reasonable inferences that support the judgment.  *Id*.  Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous.  *Id.* (citing Ind. Trial Rule 52(A)).  In determining

whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[12] A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[13] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that: (1) there is a reasonable probability that the conditions that resulted in M.T.'s removal or the reasons for placement outside

the parent's home would not be remedied; and (2) a continuation of the parent-child relationship posed a threat to M.T.'s well-being.

[14] However, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in M.T.'s removal or the reasons for his placement outside Mother's home will not be remedied.

[15] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 642-43 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* DCS need not rule out all possibilities of change. *In re Kay. L.,* 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change. *Id.*

[16] Here, our review of the evidence reveals that M.T. was removed from Mother, who had difficulty controlling her anger, because she was physically abusing M.T. by striking him with a belt and hitting him in the chest. Mother had also smoked marijuana daily, often in the presence of M.T. At the time of the termination hearing, Mother had not successfully completed any court-ordered drug or mental health programs to address her marijuana use or bi-polar and borderline personality disorders. In addition, eleven-year-old M.T. was receiving treatment for his own mental health issues. Dr. Lombard was concerned that Mother's use of marijuana in conjunction with her untreated bi-polar and borderline personality disorders elevated the risk that she would physically abuse M.T. During the course of the proceedings, Mother's visitation time was reduced because of her behavior during the visits and her refusal to help M.T. manage his emotions and use his coping skills. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in M.T.'s removal would not be remedied. There is sufficient evidence to support the termination of Mother's parental rights.

[17] Affirmed.

May, J., and Crone, J., concur.